SMITH, Justice:
A. F. Westmoreland was tried in the Circuit Court of Lee County, Mississippi, upon a charge of obtaining money under false pretenses. He was convicted and sentenced to serve a term of three years in the penitentiary.
The pertinent parts of the indictment were as follows:
[Represented to the Peoples Bank and Trust Company, Tupelo, Mississippi, a corporation, that a certain negotiable evidence of debt, to-wit: a conditional sales contract #39539, dated November 2, 1968, and purportedly signed by one William Kincaid, for the purchase of one New Holland Silage Cutter #818, Serial #53877, for the amount of $2416, was a valid contract, representing evidence of a bonafide purchase and sale agreement between the said William Kincaid and the said A. F. Westmore-land, the said A. F. Westmoreland then and there well knowing the said conditional sales contract to he a false contract and not representing evidence of a valid purchase and sale transaction between the said A. F. Westmoreland and the said William Kincaid, and by virtue of this said false representation and false pretense, the said A. F. Westmore-land did with intent to cheat and defraud the said Peoples Bank and Trust Company, sell the said conditional sales contract to the said Peoples Bank and Trust Company and did thereby fraudulently obtain from the. said Peoples Bank and *808 Trust Company, Two Thousand Two Hundred and no/100 Dollars ($2200).

Upon the trial, the prosecution established by the bank’s president that West-moreland was a farm equipment dealer and that it had been the bank’s custom to discount conditional sales contracts covering items sold by him to his customers, paying into Westmoreland’s account the contract sum, less interest. In each case, West-moreland’s personal endorsement, with recourse, was required.
The contract involved here bore date of November 2, 1968, and was handled by the bank in accordance with the above practice, the proceeds having been paid into Westmoreland’s account.
At some subsequent time, Westmoreland appears to have gotten into financial difficulties, and on June 13, 1969, he was called in by the bank to discuss some “40 or 50” of these notes or contracts which were held by the bank. At this interview with Westmoreland, the bank was represented by its attorney and an investigator employed by it, the latter a former agent of the Federal Bureau of Investigation.
After proving the hypothecation of the note to the bank by Westmoreland, the prosecution called as its witness Kincaid, the ostensible maker, to establish that he had not signed the contract. Kincaid so testified but, on further examination, although at certain points his testimony was confusing, it developed that he had in fact entered into .the transaction with West-moreland described in the contract and had authorized Westmoreland to “fix up” the papers and to sign his name thereto. The bank’s investigator also testified for the prosecution. At the January 13, 1969 discussion of the “40 or SO” Westmoreland notes held by the bank he had made notes. His note as to this particular transaction indicated that Westmoreland had told him at that time that Kincaid had not signed the contract and that Kincaid’s signature thereon had been affixed by Westmoreland himself. The original contract, which appears in the record, shows that all handwriting, including both Westmoreland’s and Kincaid’s signatures, is that of West-moreland, apparently Westmoreland having made no effort to disguise or change his handwriting in affixing Kincaid’s signature. From Westmoreland’s statement, the investigator had concluded, he said, that the note was a forgery and therefore the contract was bad.
Westmoreland testified as a witness in his own behalf. His testimony was, in substance, that he had made a trade with Kincaid to take. Kincaid’s old silage cutter in trade upon the purchase price of a new one, as indicated in the note. He stated that the new cutter, by agreement with Kincaid, was not to be delivered to Kincaid until the next Spring, which would be the first occasion upon which it would be needed. In the meantime, it appears that Westmoreland’s affairs deteriorated and that he had not been able to deliver the new cutter the following Spring because the manufacturer had taken it back or repossessed it with other of its equipment which had been delivered to him.
Kincaid’s testimony, in substance, confirms' that, in fact, he had made the “sale and purchase” agreement with Westmore-land, that he had turned in his old machine in trade, and that he had agreed with Westmoreland that the new machine was not to be delivered to him until the next Spring, the next season for cutting. He also testified, as already stated, that he had been in a hurry at the time to get started on his milk route and had directed West-moreland to fix up the papers and to sign his name.
Upon this denouement, the prosecution sought to develop that the equipment “didn’t exist.” To do this the bank’s investigator was asked what Westmoreland had said about this aspect of the matter at the January 13, 1969 interview about the “40 or SO” Westmoreland notes. The investigator’s notes included nothing about this *809 but he said that Westmoreland had stated at that time that the equipment did not exist. He had testified that he (the investigator) did not “remember at that time whether we had found any equipment not where it was supposed to be.” This statement by the investigator that Westmore-land had said on January 13, 1969, that the equipment did not exist is the only evidence tending to contradict the testimony of Westmoreland and Kincaid as to the transaction having taken place between them and that of Westmoreland that the equipment had been on hand but had been repossessed by the manufacturer. There is no evidence that the equipment did not exist upon the date when the contract was executed or upon the date when it was hy-pothecated to the bank.
 Moreover, this cannot be considered as reasonably within the purview of the false pretense charged in the indictment. Facts extrinsic to the writing relied upon as having been a false token in writing must be stated. In State v. Cohran, 226 Miss. 212, 215, 83 So.2d 827, 828, (1955), this Court said:
Because of the absence of extrinsic facts in explanation of the [false] pretense and wherein it consisted, the indictment was fatally defective. In addition, it also failed to charge that the defendants knew that the writings were false.
Under the indictment in this case the prosecution was limited to establishing as false in fact the alleged false representation set out in the indictment. The indictment charged that the contract was “false” without specifying any respect in which it was false except to say that it had not represented a bona fide purchase and sale agreement between Westmoreland and Kincaid. This charge was not proved and the evidence was to the contrary.
It is not suggested that the indictment here did not charge an offense. But charging that the writing was “false” or was a “false token in writing” does hot dispense with the necessity that the false pretense relied upon must be fairly deducible from facts set out in the indictment. At most the indictment here charged that Westmoreland and Kincaid did not enter into the transaction.
Special Supplement to Mississippi Code 1942 Annotated section 41A:3-403 (1968), among other things, provides:
(1) A signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representation. No particular form of appointment is necessary to establish such authority.
It was established by Kincaid, the prosecution’s own witness, notwithstanding some preliminary equivocation on his part, (and this was not disputed), that the transaction represented by the contract had been, indeed, a bona fide sale and purchase agreement between him and Westmoreland and that he had authorized Westmoreland to “fix up” the papers and to sign his name. Westmoreland accounted for his failure to deliver the new machine to Kincaid in the Spring in keeping with the agreement. The statement, attributed to him and said to have been made on January 13, 1969, some two and one-half months after the transaction, that the equipment did not exist was insufficient to establish beyond a reasonable doubt that it had not existed upon the date of the transaction with- Kin-caid or upon the date on which the contract had been hypothecated to the bank. Neither Westmoreland’s civil liability to the bank, (nor Kincaid’s), is in question here.
What effect the signing of Kincaid’s name to the contract by Westmoreland, with the former’s permission, may have upon Kincaid’s civil liability to the bank we are not called upon to decide in this case. Permission was given Westmoreland by Kincaid to fix up the papers and to sign his name, and in the context of the facts in *810 this case, criminality may not be imputed to Westmoreland in having- done so.
The prosecution failed to establish beyond a reasonable doubt that Westmore-land was guilty of the offense charged in the indictment and the motion requesting a directed verdict of not guilty should have been granted.
Reversed and appellant discharged.
RODGERS, P. J., and PATTERSON, ROBERTSON and SUGG, JJ., concur.